No. 31,874

E. H. Lupton, Jr., *Appellant*, v. The Merchants National Bank of Topeka, The Columbian Title & Trust Company of Topeka, and John S. Dean, *Appellees*.

(38 P. 2d 125)

Opinion filed December 8, 1934.

*J. J. Schenck, Clyde P. Schenck, E. R. Sloan, W. Glenn Hamilton, Floyd A. Sloan* and *Eldon R. Sloan*, all of Topeka, for the appellant.

*T. M. Lillard, John S. Dean* and *John S. Dean, Jr.*, all of Topeka, for the appellees.

The opinion of the court was delivered by

Harvey, J.: This is an action to recover possession of a library and for damages for its wrongful detention. Plaintiff had mortgaged the library to John S. Dean, as trustee for the other defendants. The action is predicated upon the theory that plaintiff is a resident of the state and the head of a family, that the library is a family library and exempt as such, and that his wife did not join in the execution of the mortgage, hence, that it is void. A jury was waived, the trial court made findings of fact, and held the library referred to is not exempt as a family library, and that the mortgage in question is valid. Plaintiff has appealed.

The findings, in part, show that for more than ten years prior to the date of the mortgage in question plaintiff was a resident of Kansas; that he was the head of a family, consisting of himself, his wife and a minor child, and they resided at Lawrence, in this state; that at the time he executed the mortgage, and for some years prior thereto, plaintiff was president of the Bank Savings Life Insurance Company, with headquarters at Topeka, where his office was. He began the collection of the library in question about

1924. For some time all the books purchased were kept in his home, but as the library continued to grow, with the purchase of additional books, the home was not large enough properly to care for them. About 1926 some of the books were brought to Topeka and kept in one of the rooms of the life insurance company. Additional books were purchased until, by the time the mortgage was given, March 25, 1932, the library consisted of more than 2,000 volumes. In purchasing some of these plaintiff used the name "H. & H. Book Company," in order to purchase books from various publishing houses at wholesale prices. The books in Topeka and those at his home were exchanged back and forth for examination or use as plaintiff and his wife desired. After 1931 plaintiff's purchases were limited to those works for which he previously had given subscriptions. In 1931 plaintiff and his wife planned the erection of a larger home at Lawrence, for which they had an architect draw preliminary plans, providing room suitable for the entire library; but the new home was not built.

Plaintiff testified that the books in his library were selected with a view of getting a library which would be a cross section of the recorded human thought of the people and authors of all races and of all times. His selection of such works had not been completed, but he had many of them. His library contained many books of a classical character and high rank in literature, some of them printed in the language in which they were written, others translated. It included much of the best in English literature and philosophy, also American classics and some biography. It contained about 150 books classified as of an erotic character, perhaps condemned in some degree by the federal statute (18 U. S. C. A. §§ 396, 512; 19 U. S. C. A. § 497, and Supp. § 1305). Practically all the books composing the library had been selected not only for their contents, but because of the paper, type, binding, or excellence in printing. It included volumes printed in special, limited or private press editions. For these reasons they were expensive. Of some works there were several editions. Of 117 volumes there was more than one copy of the same edition. The library consisted not only of books, but of atlases, broadsides and manuscripts. Generally speaking, the library was selected from the standpoint of the literary contents, the typography and the paper on which it was printed. It had cost the plaintiff in the aggregate more than $100,000.

The trial court found that the library did not constitute a family

library, within the meaning of our statute, because of the character and nature of the books which it contained, their cost, and the manner in which they were acquired and kept, and the purpose of the plaintiff in acquiring them, and because of the about 150 erotic books contained therein, the duplicates of some volumes, and the fact that as a whole it was weak in American and English history and in American biography, and contained nothing relating to Kansas history or the writings of Kansas authors—in short, that its contents did not indicate that it either was collected for the purpose of a family library or adapted to family use.

In this statement we have omitted what is shown by the record or found by the court pertaining to the purpose for which the mortgage in question was given and the reasons which seem to have prompted plaintiff to bring this action, for, under our view of the case, these have no bearing upon the legal questions involved.

Among the things which the head of a family residing in this state has exempt from seizure and sale, upon attachment, execution, or other process issued from any state court, is the "family library" (R. S. 60-3504). It is unlawful for either husband or wife, where that relation exists, to create any lien by chattel mortgage, or otherwise, upon any personal property owned by either or both of them, exempt by law to resident heads of families from seizure and sale upon any attachment, execution, or other process issued from any court in this state, without the consent of both husband and wife, and no such mortgage on personal property shall be valid unless executed by both husband and wife (R. S. 58-312). The plaintiff's wife did not execute the mortgage in question, nor give her consent thereto.

The principal question before us is whether these two sections of the statute were properly construed by the trial court. The only other sections of our statute we find in which the family library specifically is mentioned are R. S. 22-511, pertaining to decedents' estates, providing for the selection and setting apart for the use of the widow and minor children of a decedent the family library and other property; and R. S. 79-201, providing a special exemption from taxation of the family library and school books, to an amount stated, in addition to other exemptions. But neither of these sections has a direct bearing upon the question before us.

The term "family library" is not defined in our statutes, nor has this court previously been called upon to define it; neither have we

been able to find, or counsel find for us, in other jurisdictions any definition of the term as to what class of books, manuscripts and the like it may contain. It is clear our legislature placed no limitation of that kind upon a family library. Apparently the legislature left it to the family, or the head of the family, to determine what books should compose the family library. The legislature also placed no limitation upon the value of a family library which would be exempt from execution or other process, although it did place such limitation as to value with respect to some other classes of property. (See R. S. 60-3504.) It is clear, therefore, that the legislature did not intend to place a limitation upon the cost or value of a family library. Whether it would have been wise or prudent for the legislature to say to a family, or the head of a family, what selection of books shall compose a family library, on what paper and of what type they shall be printed, or what degree of skill the printer shall have, how they shall be bound, and what shall be their maximum cost or value, we need not consider. That was for the legislature to determine. No one contends it did not have authority to do so. Since the legislature placed no limitation upon a family library in these respects the court should not attempt to do so, and certainly no mortgagee of a family library should be permitted to cull it and say which books were and which were not proper to be included in a family library.

In the New York common pleas court, in *Robinson's Case*, 3 Abb. Prac. Rep. 466 (1856), the headnote reads:

"The professional books necessary to a professional man who supports a family for the practice of his profession, are exempt from execution as a part of his 'family library.'"

In the opinion it was said:

"It is true that the statute does not designate of what the family library shall consist, and it may be that books of a miscellaneous but instructive character are contemplated, without reference or regard to the scientific books which may constitute the chief means of the debtor's support. The head of a family whose vocation is one of the learned professions, will be protected to a reasonable extent in the possession of books which are to him necessary for the revelations they contain, and a reasonable amount of miscellaneous matter, as well for his use as for the use of his family." (p. 467.)

Appellees stress the word "reasonable," as there used, as tending to indicate a limitation upon the number or value of books composing the library. But, observe, the point before the court was whether professional books of a professional man were exempt as a

part of his "family library." Our statute, by specifically making the library of a professional man exempt (R. S. 60-3504, 9th clause), would render unnecessary a decision upon that question in this state. That decision does not purport to hold that the family library itself was subject to such reasonable limitations. We are unable to find that the Robinson case has been cited elsewhere.

In *Commonwealth v. Glover*, 132 Ky. 588, 116 S. W. 769 (1909), the court had before it the question whether certain personal property was sufficiently described for the purposes of taxation in a personal-property-tax statement made by the head of a family. The "library" was described by that word only. That was held sufficient. In the opinion the court said:

"As 'household effects' means the furnishings of one's residence, so the word 'library' means such books or works of literature, science, art, or business as one may have in his residence or office." (p. 604.)

These are the only cases cited which attempt in any way to define a family library. Several cases have to do with the library of a professional man (see Amer. Dig., Exemptions, § 47), but none of these limit the number or kind of books composing such a library, or its value, unless the statute being construed had fixed such a limitation. The mere fact that many of the books were left at Topeka most of the time does not justify a holding that they were not a part of the family library. (See *Nuzman v. Schooley*, 36 Kan. 177, 179, 12 Pac. 829.) Neither does the fact that duplicates were purchased of a relatively few of the books justify such a holding. No contention is made that the mortgage should be held good on such duplicates.

Some months after this mortgage was executed, and after there had been a marked change in plaintiff's financial affairs, to his detriment, the evidence disclosed that he sold some of the books of his library. (Whether the books so sold were some of those described in this mortgage appears to have been a controverted question, which we are not asked to decide.) The trial court in its findings construed this sale as an indication that the library in question had not been acquired for a family library. The sale, under the circumstances made, did not sustain that view.

Much was said in the trial court, and it is mentioned here, about the 150 books in the library classified as being of an erotic character, the importation, transportation, possession, or sale of which was condemned, or prohibited, or put under some kind of a ban by a

federal statute. We give no special consideration to this for two reasons: (1) There was no attempt in the trial court to show that any specific book in the library fell under the ban of the federal statute under the classification, rules and regulations of the federal department authorized to administer and apply the statute. (2) We are unable to see how this contention can aid defendants. If some of these books are of a class of property the possession, transportation, or sale of which is prohibited by law, by what right or authority could defendants purchase them, or take any valid mortgage on them?

We feel compelled to hold the trial court erred in holding the library in question not exempt as a family library because of the character of books it contained, or its value. It necessarily follows that the mortgage in question was void. (R. S. 58-312; *Alexander v. Logan,* 65 Kan. 505, 70 Pac. 339; *Searle v. Gregg,* 67 Kan. 1, 72 Pac. 544; *Wickham v. Bank,* 95 Kan. 657, 149 Pac. 433; 96 Kan. 350, 150 Pac. 513; *Hoxie State Bank v. Vaughn,* 137 Kan. 648, 21 P. 2d 356.)

Appellees argue that the judgment of the trial court should stand even though the property was exempt as a family library and the mortgage itself was void. This argument is predicated upon the view that the court found plaintiff in effect sold the library to defendant to be applied upon the debt secured by the mortgage by an agreement made some months after the mortgage was executed. They point out that the statute (R. S. 58-312) does not prohibit the sale by the husband of exempt property, but only declares to be invalid a mortgage or other lien which he alone attempts to place thereon. That construction of the statute is correct. On this point appellees cite and rely on *Beach v. Fireovid,* 84 Kan. 357, 114 Pac. 206, where, under the facts in that case, the court found what was done amounted to a sale of the property. The trial court in this case did not base its judgment on a sale of the property, and made no conclusion of law to that effect, nor would the evidence have justified such a holding.

Notwithstanding the fact that the court did not predicate its ruling or judgment thereon, it did find, in substance, that after the mortgage was executed plaintiff communicated to the defendant his desire that the mortgaged property be sold and the proceeds applied on the debt secured by it; that defendant agreed to it, and there was some talk of sending the books to New York for that purpose;

that the library was packed in boxes suitable for transportation to New York; that the books were later delivered into the possession of John S. Dean, as trustee for the defendant bank and trust company, and by him removed and stored in another building; that under the arrangement and agreement between the plaintiffs and John S. Dean, trustee, the library was delivered into the possession of Dean, as trustee, to be sold by him and the proceeds applied on the indebtedness mentioned in the chattel mortgage. Defendants moved to set these findings aside as not being supported by the evidence. The motion should have been sustained. On that point Mr. Dean testified in substance that after the mortgage was executed, and before the relations of the parties became estranged, he and plaintiff talked about disposing of the library described in the mortgage, and that plaintiff consented the books might be sold; that it was thought they could best be sold in New York; that the books were boxed suitable for shipment; that on investigating the matter of sending the books to New York for sale it was found the expense would be considerable and that plaintiff was not in position to pay it; that it also was thought not to be a suitable time to endeavor to sell the books in New York, so nothing was done about selling them; that later, and after the business relations of the parties became estranged, the defendant Dean thought best to have the agreement, as he understood it, between him and plaintiff reduced to writing, and prepared a writing embodying the agreement as he understood it. This, by several "whereases," recited the fact that the mortgage had been given; that the parties had contemplated sending the books to New York to be sold; that pursuant to that plan the library had been packed and stored for shipment; that the parties agreed the financial conditions prevailing throughout the country rendered it inopportune to carry out the plan for the sale of the library in New York, and it was therefore agreed that the library should remain in storage until John S. Dean, as trustee, deemed it expedient to offer the same for sale; therefore, "it is agreed between the parties that the lien of said mortgage shall be and remain in full force and effect, and that the said mortgagee shall be under no obligations to sell said library until notified in writing to that effect by the mortgagor, although he may do so if he deems it advisable;" in the meantime the library to be held in storage. Defendant presented this writing to plaintiff, who refused

to sign it. After some discussion, however, he did sign a statement, dictated by Mr. Dean and written on the bottom of the instrument above described, which statement reads as follows:

"The above-described property is now held for the mortgagee above mentioned in the basement room located in the northwest corner of the Capitol Building and Loan building, being a room rented by the Bank Savings Life Insurance Company."

It will be noted that in the instrument prepared by Mr. Dean the final agreement which he sought to have there made was that "the lien of said mortgage shall be and remain in full force and effect," and what plaintiff did sign stated the property "is now held for the mortgagee." In other words, both of these instruments dealt with and recognized the mortgage; neither of them treated anything that had been done in the past as a sale of the property. Neither does the evidence show that plaintiff delivered the mortgaged property to the defendant Dean. What happened was that plaintiff was let out of the position of president of the Bank Savings Life Insurance Company and a new president was elected. Mr. Dean presented the instrument which plaintiff had signed, last above quoted, to the new president of the life insurance company, who permitted Mr. Dean to take the books out of the building in which they had been placed by plaintiff to a building where the defendant Dean has his office. No one contends that the Bank Savings Life Insurance Company ever had any ownership in these books, or that its new president had any authority to deliver them to anyone, unless it would be to the plaintiff.

The result is, there was no sale of this property by the plaintiff to the defendants, or any of them.

The judgment of the court below is reversed, with directions to enter judgment holding the mortgage to be void, and to take such further proceedings in the case as are in harmony with this opinion.

BURCH, J. (dissenting in part): I agree with paragraph 1 of the syllabus as written. The "family library" mentioned in the statute may be composed of such books as the family, or head of the family, may select, and there is no statutory limitation on value of the "family library."

My view is that in this instance we are not dealing with a family library. We are dealing with an accumulation of books acquired by a book collector, after the fashion of book collectors, at a cost of

$100,000. Whether the library was that of a collector or was assembled as a family library was a question of fact. The trial court determined the fact adversely to plaintiff on evidence which I regard as fully warranting the trial court's conclusion.